J-A07020-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DOUGLAS JOHN LAMBERT, IV | : | |
| | : | |
| Appellant | : | No. 747 EDA 2022 |

Appeal from the Judgment of Sentence Entered March 3, 2022
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0004126-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DOUGLAS JOHN LAMBERT, IV | : | |
| | : | |
| Appellant | : | No. 748 EDA 2022 |

Appeal from the Judgment of Sentence Entered March 3, 2022
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0004157-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DOUGLAS JOHN LAMBERT, IV | : | |
| | : | |
| Appellant | : | No. 749 EDA 2022 |

Appeal from the Judgment of Sentence Entered March 3, 2022
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0001143-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

|  | : |  |
|---|---|---|
| v. | : | |
| | : | |
| | : | |
| DOUGLAS JOHN LAMBERT, IV | : | |
| | : | |
| Appellant | : | No. 750 EDA 2022 |

Appeal from the Judgment of Sentence Entered March 3, 2022
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0001964-2018

BEFORE: DUBOW, J., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McLAUGHLIN, J.:               **FILED JULY 12, 2023**

Douglas John Lambert, IV appeals from the judgment of sentence following his convictions for flight to avoid apprehension, trial or punishment; firearms not to be carried without a license; two counts of persons not to possess, use, manufacture, control, sell or transfer firearms; possession with intent to deliver a controlled substance ("PWID"); and accidents involving damage to unattended vehicle or property.[1] Lambert challenges the denial of his motion to suppress and argues the evidence was insufficient to sustain his PWID conviction. We affirm.

On September 23, 2017, police were notified of a vehicle accident. When they arrived on the scene, the driver of the vehicle was not present. Police later identified Lambert as the driver and filed charges against him. Lambert filed a motion to suppress all evidence seized from his vehicle, a later search of his home, and any DNA testing results. **See** Defendant's Omnibus Pre-Trial

---

[1] 18 Pa.C.S.A. §§ 5126(a), 6106(a)(1), 6105(c)(8); 35 P.S. § 780-113(a)(30), and 75 Pa.C.S.A. § 3745(a), respectively.

Motion, filed 11/27/18. He argued that officers did not have probable cause to search his vehicle. *Id.* at ¶¶ 3, 7. He claimed that the search warrant for his home likewise "lack[ed] sufficient probable cause" and that "[t]here was no nexus between the crimes under investigation and the search proposed in the warrant." *Id.* at ¶ 9. He also argued that "the affidavit contain[ed] material misstatements[.]" *Id.*

The trial court made the following findings of fact following the suppression hearing:

> On September 23, 2017 at approximately 3:00 a.m., Officer [John] Bogan was on duty working the 6:00 p.m. to 6:00 a.m. shift. (Suppression Hearing Transcript, 1/10/19, N.T. 9-10). . . .
>
> At approximately 3:02 a.m., Officer Bogan was dispatched to the area of Oak Street and Virginia Avenue for an accident in the City of Coatesville. (Suppression Hearing Transcript, 1/10/19, N.T., 10, 82). . . . Officer Bogan arrived at the scene at approximately 3:04 a.m. (Suppression Hearing Transcript, 1/10/19, N.T. 82).
>
> When he arrived at the scene, Officer Bogan observed a Chevy Malibu that had struck a utility pole, causing the pole to split in half approximately halfway up the pole. (Suppression Hearing Transcript, 1/10/19, N.T. 10-11). The power in the neighborhood had gone out. (Suppression Hearing Transcript, 1/10/19, N.T. 70). The Chevy Malibu was still running, with its hazard lights activated, albeit unattended. (Suppression Hearing Transcript, 1/10/19, N.T. 71; 1/10/19, Ex. C-4; 1/15/19, Ex. D-3). The Chevy Malibu was stopped on the berm of the road, not blocking traffic. (Suppression Hearing Transcript, 1/10/19, N.T. 23; 1/15/19, Ex. D-3). The Chevy Malibu had heavily tinted windows. (Suppression Hearing Transcript, 1/10/19, N.T. 27).
>
> Officer Bogan observed that the vehicle "sustained heavy front end damage. There was – the windshield of the vehicle

had an indent where it appeared that the driver's head struck. The telephone pole was split in half about halfway up." (Suppression Hearing Transcript, 1/10/19, N.T. 10-11; 1/10/19, Ex. C-4).

The impact deployed the vehicle's airbag. (Suppression Hearing Transcript, 1/10/19, N.T. 11; 1/10/19, Ex. C-4).

Officer Bogan spoke to one Officer Batykefer, who had already arrived on the scene. (Suppression Hearing Transcript, 1/10/19, N.T. 18, 19). There were multiple people at the scene, including various emergency service personnel, many of whom were shining flashlights in and around the vehicle. (Suppression Hearing Transcript, 1/10/19, N.T. 20).

Officer Batykefer told Officer Bogan that he observed blood on the vehicle. (Suppression Hearing Transcript, 1/10/19, N.T. 19).

When standing next to the exterior of the driver's side of the car, Officer Bogan observed blood on the airbag and blood on the driver's side rear door. (Suppression Hearing Transcript, 1/10/19, N.T. 11, 13, 26-27; 1/10/19, Ex. C-4).

\*\*\*

Officer Bogan testified that the driver's side rear door was locked. (Suppression Hearing Transcript, 1/10/19, N.T. 15).

Officer Bogan testified that he was "very concerned due to the condition the vehicle was in and the split pole that I knew whoever was operating that vehicle could be seriously injured." (Suppression Hearing Transcript, 1/10/19, N.T. 13).

Officer Bogan testified that another officer "asked the radio room to notify the hospitals in the area for any walk-ins for injuries from the car accident" to make sure that whoever was driving the vehicle was okay and receiving medical treatment. (Suppression Hearing Transcript, 1/10/19, N.T. 14).

\*\*\*

Officer Bogan also contacted a towing company. (Suppression Hearing Transcript, 1/10/19, N.T. 14, 15). He

contacted the towing company because he needed to remove the vehicle from the roadway. (Suppression Hearing Transcript, 1/10/19, N.T. 14).

The police ran the vehicle's registration but the record came back only as a temporary tag registered to Lambert Auto Sales, indicating it was probably recently purchased. (Suppression Hearing Transcript, 1/10/19, N.T. 14, 20, 24, 37, 43). . . .

\*\*\*

The police body camera video played by the defense recorded somebody saying words to the effect of "that's got to be Dougie, he live [sic] on Charles Street[.]" (Suppression Hearing Transcript, 1/10/19, N.T. 28). Officer Bogan testified at the Suppression Hearing that he believes that the speaker was referring to [Lambert]. (Suppression Hearing Transcript, 1/10/19, N.T. 28; 1/15/19, Ex. D-3). Despite the references to "Dougie" on "Charles Street", no officer went to check on [Lambert] at Charles Street. (Suppression Hearing Transcript, 1/10/19, N.T. 29, 44).

\*\*\*

Officer Bogan had no verification of the truth of these statements referring to "Dougie" being the owner of the damaged vehicle. (Suppression Hearing Transcript, 1/10/19, N.T. 54).

The police body camera video played by the defense contains audio of Officer Batykefer saying words to the effect of "let's just write it up as an unattended accident and move on from here [.]" (Suppression Hearing Transcript, 1/10/19, N.T. 32-33; 1/15/19, Ex. D-3).

\*\*\*

When the tow truck arrived, the tow truck was able to pull the vehicle away from the embankment. (Suppression Hearing Transcript, 1/10/19, N.T. 14, 15, 42-43). Officer Bogan testified that this is not a gentle process, but sometimes results in the contents of the vehicles getting "jostled" around. (Suppression Hearing Transcript, 1/10/19, N.T. 56-57).

When the tow truck pulled the vehicle away from the embankment, Officer Bogan then entered the front passenger's side door, which was now accessible to him. (Suppression Hearing Transcript, 1/10/19, N.T. 14, 15, 43, 69-70).

Inside the vehicle, Officer Bogan reached into the glove compartment to see if he could find some type of registration or any information that would link the vehicle to an owner. (Suppression Hearing Transcript, 1/10/19, N.T. 15, 44).

Officer Bogan testified that he was motivated to search for the owner of the vehicle because he wanted to know "who and where they were and if they were okay." (Suppression Hearing Transcript, 1/10/19, N.T. 15).

Officer Bogan located a pink slip, or bill of sale, for the vehicle in the vehicle's glove compartment that contained the names Chamise Bell and Douglas Lambert and listed an address on South First Avenue. (Suppression Hearing Transcript, 1/10/19, N.T. 16, 44, 60, 76). The pink slip was located in the glove compartment near the top. (Suppression Hearing Transcript, 1/10/19, N.T. 49). Officer Bogan estimated that he was inside the vehicle for approximately thirty (30) seconds to one (1) minute. (Suppression Hearing Transcript, 1/10/19, N.T. 49, 61).

After the vehicle had been moved away from the embankment and Officer Bogan had discovered the pink slip, Officer Batykefer told Officer Bogan that he could now see a handgun on the driver's side floorboard. (Suppression Hearing Transcript, 1/10/19, N.T. 16, 18, 19, 45, 58, 65).

Officer Batykefer made this observation while standing outside of the vehicle and looking into the vehicle from the driver's side. (Suppression Hearing Transcript, 1/10/19, N.T. 16, 45).

Upon receiving this information, Officer Bogan put all of the paperwork back into the Chevy Malibu and exited the vehicle. (Suppression Hearing Transcript, 1/10/19, N.T. 16, 69).

Officer Bogan entered the driver's side of the vehicle and observed the firearm where Officer Batykefer had said he

observed it. (Suppression Hearing Transcript, 1/10/19, N.T. 16-17, 65).

Officer Bogan did not secure the firearm. (Suppression Hearing Transcript, 1/10/19, N.T. 17, 46). No officer touched the firearm that night. (Suppression Hearing Transcript, 1/10/19, N.T. 46-47).

Officer Bogan testified that he did not secure the firearm because he knew that the police needed to apply for a search warrant. (Suppression Hearing Transcript, 1/10/19, N.T. 17).

\*\*\*

Officer Batykefer followed the vehicle while it was towed back to the police station. (Suppression Hearing Transcript, 1/10/19, N.T. 17, 46, 48).

Subsequently, a search warrant was obtained for the vehicle. (Suppression Hearing Transcript, 1/10/19, N.T. 17).

\*\*\*

Officer Bogan testified that he did not expect his investigation of this accident to become a criminal investigation. (Suppression Hearing Transcript, 1/10/19, N.T. 35, 54). He thought he was investigating an accident and was concerned about somebody being injured. (Suppression Hearing Transcript, 1/10/19, N.T. 54). He did agree however that at the time of his investigation, he did have evidence of the crime of leaving the scene of an accident that caused damage to unattended property. (Suppression Hearing Transcript, 1/10/19, N.T. 63).

Opinion, filed 6/5/19, at 3-10, ¶¶ 2-9, 11-13, 15-16, 18, 20-21, 24-34, 36-37, 39 (footnotes omitted).

Following the hearing, Lambert filed a brief in support of his motion to suppress. He challenged the alleged misstatements in the affidavit, citing *Franks v. Delaware*, 438 U.S. 154 (1978). He further claimed that "there was not a sufficient nexus between the crime on the street and the [Lambert's]

- 7 -

residence," and that officers violated the knock and announce rule of Pa.R.Crim.P. 207. He further argued that police lacked probable cause to search his car. **See** Defendant's Brief in Support of His Motion to Suppress Evidence, filed 3/11/19, at 9-13, 21-23, 26-28, 34-38.

The trial court denied the motion to suppress. It concluded the warrantless search of the car was covered by the public servant exception of the community caretaking doctrine, citing **Commonwealth v. Livingstone**, 174 A.3d 609 (Pa. 2017). **See** Opinion, filed 6/5/19, at 40-43. It explained, "Officer Bogan's brief and limited warrantless intrusion into the interior of the Chevy Malibu for the purpose of determining who the owner of the vehicle was in order to determine if that person or another of which he might have knowledge required assistance was justified under the public servant exception of the community caretaking doctrine." **Id.** at 46, ¶ 113. The court also determined that the search was covered under Pennsylvania's automobile exception under the then-applicable precedent of **Commonwealth v. Gary**, 91 A.3d 102 (Pa. 2014) (plurality), which was later overruled by **Commonwealth v. Alexander**, 243 A.3d 177 (Pa. 2020). **See** Opinion at 47-49.

Two years later, Lambert filed a motion for reconsideration arguing that neither the community caretaking doctrine nor the automobile exception applied, that the firearm was not in plain view and that the basis for the warrant of his home "was improper and had a multitude of misstatements and omissions." Motion to Reconsider, filed, 8/30/21 at 12. He also claimed that

the officer's knock and announce at his home was insufficient. The court denied the motion. *See* Order, 8/31/21.

Lambert proceeded to a bench trial. Relevant to this appeal, Detective Jonathan Shave testified that he along with other detectives executed a warrant at 313 Charles Street. N.T., Trial, 9/1/21, at 40, 70. He said that the Charles Street address was "the residence of Mr. Douglas Lambert." *Id.* at 70. Detective Shave testified that he recovered "a large clear plastic bag that had methamphetamine particles in it" from the second-floor bedroom of the Charles Street residence. *Id.* at 74, 124. In that same bedroom, Detective Shave also recovered Lambert's passport and mail addressed to him. Some mail was addressed to the Charles Street address and other mail listed the address on Lambert's license. *Id.* at 75, 78, 122, 139.

The court found Lambert guilty of the above-referenced crimes and sentenced him to an aggregate term of eight and a half to 19 years' incarceration. This timely appeal followed.

Lambert presents the following claims:

> Whether the suppression court erred when it failed to suppress evidence obtained in violation of Article I, Section 8 of the Pennsylvania Constitution which reads, in pertinent part, as follows:
>
>> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported

by oath or affirmation subscribed to by the affiant.

1. The search warrant prepared by Detective Jonathan Shave is unconstitutionally overbroad. It did not set forth in clear and specific terms the items to be searched and seized. The warrant authorized a general search, and the kind of "rummaging" banned by Article I, Section 8 of the Pennsylvania Constitution. Assessment of the validity of the description contained in the warrant must be measured against those items for which there was probable cause to search. Any unreasonable discrepancy between the items for which there was probable cause and the description in the warrant requires suppression. In this situation, the search warrant was used as a device to rummage through the property at 313 Charles Street. In this case, the charge was firearms not to be carried without a license under 18 PACSA 6106. It is not a crime to have firearms in a house under 18 PACSA 6016. There was no reason to believe that an unlicensed firearm would be found at 313 Charles Street. Police had already seized an unlicensed firearm in the crashed vehicle, but there was no rational basis to assume another firearm would be found inside the property at 313 Charles Street, the property titled to Lambert's grandfather. All evidence against Lambert must be suppressed as fruit of the poisonous tree of the general search of 313 Charles Street.

2. The warrantless search of a 2008 Chevy Malibu which crashed into a pole in Coatesville, and was disabled. When police arrived, the vehicle was unoccupied, and had sustained severe front-end damage. The vehicle was so disabled it could not be driven away. When a tow truck arrived, the vehicle was searched without a warrant. Police discovered a firearm lying on the front driver's side floor with serial number S3242133. There was no reason to believe the firearm was illegal. The police had no probable cause to search the vehicle. There were no exigent circumstances to support a warrantless search, and no probable cause. As stated above, the warrantless search recovered a stolen firearm but the police did not know it was stolen. The warrantless search without both probable cause and exigent circumstances violated *Commonwealth v. Alexander*, 243 A3d 177 (PA 2020).

- 10 -

> The Alexander case is retroactive to cases pending on direct appeal. The warrantless search started the ball rolling, and it was the "poisonous tree" without which there was no case. It was the excuse for the search of Lambert's grandfather's house at 313 Charles Street where the police executed a warrant and found another firearm, and a relatively small amount of cocaine and an even smaller quantity of methamphetamine. There was no probable cause to believe these items would be found at 313 Charles Street. The items discovered in 313 Charles Street are fruit of the poisonous tree of the warrantless search of the crashed vehicle. The items must be suppressed. All evidence against Lambert must be suppressed as fruit of the poisonous tree.

> 3. The evidence was insufficient to prove that Lambert had knowledge of the drugs found at 313 Charles Street or constructive possession of the drugs found at 313 Charles Street. The evidence indicated that Lambert and another man occupied 313 Charles Street. The evidence indicates Lambert did not have the drugs on his person eliminating a theory of actual possession. The theory of prosecution was constructive possession. Another person had access to the property. Constructive possession is evidence showing the intent and capability to exercise control over the drugs. There was no evidence that Lambert had dominion and control over the drugs found in 313 Charles Street. There was no evidence Lambert knew the drugs were present at 313 Charles Street.

Lambert's Br. at 2-4.

Lambert's first and second issues challenge the court's denial of his motion to suppress. When reviewing the denial of a motion to suppress, we determine "whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. McMahon*, 280 A.3d 1069, 1071 (Pa.Super. 2022) (citation omitted). We "consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted." *Id.*

- 11 -

(citation omitted). "Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial." *Id.* (citation omitted).

Lambert claims that the search warrant of the Charles Street residence was overbroad in its request to search for firearms and that the warrant was insufficiently specific. This issue is waived. Rule 581(D) of the Rules of Criminal Procedure provides that a motion to suppress "shall state *specifically and with particularity* the evidence sought to be suppressed, the grounds for suppression, and the facts and events in support thereof." Pa.R.Crim.P. 581(D) (emphasis added). In his motion to suppress Lambert did not claim that the search warrant was overbroad or not specific enough. Instead, he claimed that no probable cause existed to search the home, that there was no nexus between the search and recovery of the firearm from his vehicle and Lambert's home, and that there were misstatements in the search warrant. *See* Lambert's Omnibus Pre-Trial Motion, filed 11/27/18, at ¶ 9. Nor did he make any mention of an overbreadth issue at argument. *See* N.T., Motion to Suppress, 1/10/19, at 4-5.[2] The claim is waived. *See Commonwealth v. Freeman*, 128 A.3d 1231, 1242 (Pa.Super. 2015) (finding waiver of challenge

---

[2] On appeal, Lambert maintains that this issue is not waived and directs us to his Brief in Support of Motion and his Motion for Reconsideration. *See* Lambert's Br. at 20 (citing Reproduced Record at 318, 326, 345-48) & Lambert's Reply Br. at 1 (citing Reproduced Record 318, 345-47). The pages Lambert cites do not discuss his overbreadth issue, and we have not found any other place in the briefs he cites where he makes the argument he now makes.

to consent to search and scope of consent where defendant failed to raise challenge in motion to suppress or at suppression hearing).

Lambert's second issue addresses whether the court erred in denying his motion to suppress evidence found in his vehicle. Lambert claims that "the officers searched the interior of the car and discovered the firearm." Lambert's Br. at 22. He claims the court erred in concluding that the public servant exception to warrantless searches applied because here "[t]he police action was not independent of detection, investigation of evidence in a criminal case." *Id.* at 23. He further argues that the search violated *Commonwealth v. Alexander*, 243 A.3d 177 (Pa. 2020).

The Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution protect citizens against unreasonable searches and seizures. This protection requires police to obtain a warrant before conducting a search unless an exception applies. "[A] search without a warrant may be proper where an exception applies and the police have probable cause to believe a crime has been or is being committed." *Commonwealth v. Livingstone*, 174 A.3d 609, 625 (Pa. 2017) (citation omitted).

One such exception is the community caretaking doctrine. *See id.* at 625-626. The community caretaking doctrine encompasses three exceptions: "the emergency aid exception; the automobile impoundment/inventory exception; and the public servant exception, also sometimes referred to as

the public safety exception." *Id.* at 626-627.[3] Under each of these exceptions, an officer's actions should be "motivated by a desire to render aid or assistance, rather than the investigation of criminal activity." *Id.* at 627.

Under the public servant exception of the community caretaking doctrine, the Commonwealth must establish: (1) "specific, objective, and articulable facts that would reasonably suggest to an experienced officer that a citizen is in need of assistance[;]" (2) "the police caretaking action [was] independent from the detection, investigation, and acquisition of criminal evidence[;]" and (3) "the level of intrusion [was] commensurate with the perceived need for assistance." *Id.* at 634, 635, 637. For the final prong of this exception, there must be "an assessment of the circumstances surrounding the seizure, including, but not necessarily limited to, the degree of authority or force displayed, the length of the seizure, and the availability of alternative means of assistance." *Id.* at 637. "Once assistance has been provided or the peril mitigated, further police action will be evaluated under traditional Fourth Amendment jurisprudence." *Id.*

Here, the court determined that all three factors of the public servant exception to the community caretaking doctrine were satisfied. We discern no error. Regarding the first prong, Officer Bogan testified he was "very

---

[3] While *Livingstone* involved a claim of an unreasonable seizure, the Court there explained that the doctrine also applies to searches, stating, "[W]hen the community caretaking exception is involved to validate *a search or a seizure*, courts must meticulously consider the facts and carefully apply the exception in a manner that mitigates the risk of abuse." *Livingstone*, 174 A.3d at 637 (citation omitted) (emphasis added).

concerned due to the condition the vehicle was in and the split pole that I knew whoever was operating that vehicle could be seriously injured." N.T., Suppression Hearing, 1/10/19, at 13. He noted that there was blood inside and outside of the vehicle, the vehicle had heavy front-end damage, and it appeared that the driver had struck their head on the windshield. *Id.* 10-11, 13, 26-27. As to the second prong, Officer Bogan testified that he wanted to determine the owner or driver of the vehicle to ensure "who and where they were and if they were okay." *Id.* at 15. He further testified that another officer "asked the radio room to notify the hospitals in the area for any walk-ins for injuries from the car accident" to ensure that whoever had been driving was able to get medical treatment. *Id.* at 14. Lambert claims that the officers' search of the vehicle originated from them investigating a crime. However, Officer Bogan was "able to point to specific, objective, and articulable facts which, standing alone, reasonably would suggest that his assistance [was] necessary," and therefore "a coinciding subjective law enforcement concern by the officer will not negate the validity of that search" under this exception. *Livingstone*, 174 A.3d at 637.

Finally, the evidence supports the determination that Officer Bogan's actions were tailored to the assistance that he sought to provide. He testified that he was inside the vehicle for approximately 30 seconds to one minute as he copied down the information from the pink slip, he recovered from the glove compartment. Thus, his level of intrusion was commensurate with the perceived need for assistance of the driver of the vehicle. Therefore, we

conclude that Officer Bogan's search of the vehicle by opening the glove compartment was covered under the community caretaking doctrine.

Lambert's claim under **Alexander** does not warrant relief. The Court in **Alexander** overruled **Gary** and held that Pennsylvania's automobile exception requires both probable cause and exigent circumstances. **Alexander**, 243 A.3d at 181, 209. Here, the trial court's application of **Gary's** version of the automobile exception – which was the law at the time – does not warrant relief as the court applied the public servant exception, and did so properly, as explained above.

Lambert's final claim addresses the sufficiency of the evidence for possession of methamphetamines recovered from the Charles Street residence. He maintains that the Commonwealth failed to prove constructive possession. He argues that no evidence connects him to the narcotics in the house. He also notes that another male occupied the house and was the owner of the narcotics and drug paraphernalia in the home.

When reviewing a challenge to the sufficiency of the evidence we view the evidence in the light most favorable to the Commonwealth. **Commonwealth v. Jackson**, 215 A.3d 972, 980 (Pa.Super. 2019) (citation omitted). Evidence is sufficient where "it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." **Commonwealth v. Wright**, 255 A.3d 542, 552 (Pa.Super. 2021) (citation omitted). "The Commonwealth may sustain its burden by means of wholly circumstantial evidence." **Id.** (citation omitted).

The Commonwealth may prove possession by establishing constructive or actual possession. Constructive possession is "the power to control the contraband and the intent to exercise that control." ***Commonwealth v. Hopkins***, 67 A.3d 817, 820 (Pa.Super. 2013) (citation omitted). The Commonwealth may prove constructive possession by a totality of the circumstances. ***Id.*** Additionally, more than one person may constructively possess the same item when "the item in issue is in an area of joint control and equal access." ***See Commonwealth v. Johnson***, 26 A.3d 1078, 1094 (Pa. 2011) (citation omitted).

Here, the trial court concluded that "[i]t is reasonable to infer from the totality of the circumstances that [Lambert], who kept his personal belongings on each level of the home, knew that the controlled substances and paraphernalia were in the home, had the ability to exercise conscious dominion over these items, the power to control these items, and the intent to exercise that control[.]" Opinion *Sur* Rule 1925(a), filed 6/28/22, at 35.

This was not error. Viewing the facts in the light most favorable to Commonwealth, the evidence was sufficient to prove that Lambert constructively possessed the methamphetamines found in the second-floor bedroom. The narcotics were found in the same area as his personal items, including his passport and mail. ***See Commonwealth v. Walker***, 874 A.2d 667, 678 (Pa.Super. 2005) (finding sufficient evidence of constructive possession of narcotics found in a basement along with mail addressed to defendant). Furthermore, the fact that another individual lived in the home

does not sway our conclusion because more than one person can constructively possess an item. ***See Johnson***, 26 A.3d at 1094.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/12/2023